# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF NEW JERSEY

MARTIN ROTH, CHARI ROTH, and RACHEL
ROTH on behalf of themselves and all others
similarly situated,

        Plaintiffs,

    v.

BLACKBAUD, INC.,

        Defendant

Case No _____

**CLASS ACTION**
**JURY TRIAL DEMANDED**

1.     Plaintiffs Martin Roth, Chari Roth, and Rachel Roth ("Plaintiffs"), individually and on behalf of all others similarly situated , bring this action against Blackbaud, Inc. ("Blackbaud") to obtain damages, restitution, and injunctive relief for the Class, as defined below, Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## <u>NATURE OF THE ACTION</u>

2.     This class action arises out of the ransomware attack and data breach which occurred intermittently between February 7, 2020 and May 20, 2020 of Blackbaud (the "Data Breach"), an entity that currently and has provided cloud solutions to not for profit companies, including educational institutions for decades on various forms of its software, including its Educational Edge software and legacy versions of that software.

3.     This action ("Action") arises from the Data Breach of certain unencrypted information, including social security numbers, that Blackbaud maintained in legacy versions of its Educational Edge and other programs, which Blackbaud knew was unencrypted and thus subject to breach and misuse,

but which could not be seen by the ultimate customer. Such encrypted information included the social security numbers of students and faculty who were associated with various institutions as early as the 1990's.

4.     At the time of the Data Breach, unbeknownst to its customers and their students and faculty, Blackbaud maintained their highly confidential personal identifying information including Social Security numbers, in unencrypted form on "old unused system tables" remaining from legacy versions of the Educational Edge platform and failed to take steps to encrypt that information thereby subjecting it to the risk of being hacked. In about the end of September and October 2020, Blackbaud notified various institutions that in fact, that unencrypted information was hacked during the Data Breach, and that it was now going to take steps to encrypt this information—a step that should have been taken years ago.

5.     Plaintiffs thus bring this action against Blackbaud for knowingly, recklessly or negligently failing to take steps to either remove such unencrypted information from its data bases or to encrypt such information, thereby subjecting such information to a data breach, and for the damages that they and Class Members have and will sustain as a result of the Data Breach.

6.     Such information constitutes personal identifying information, or information that generally incorporates information that can be used to trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. The PII of Plaintiffs and Class Members that was accessed illegally contained non-public or confidential PII that was otherwise not obtainable through public sources.

7.     As a result of Blackbaud's knowing, reckless or negligent conduct, in storing and failing to remove or encrypt Plaintiffs' and Class Members' PII, cyber criminals were able to steal enough information to steal the victims' identity and cause damage to thousands, if not tens of thousands or more, of persons' finances and personal lives.

8.      On July 16, 2020 a breaking news story by the *NonProfit Times* reported that Blackbaud had been the subject of a ransom ware attack, which Blackbaud claimed it first learned of in May 2020, and that Blackbaud had paid a ransom to the cybercriminal.in an undisclosed amount using bitcoin. (the "July 16 Announcement").  The *NonProfit Times* reported that the Blackbaud spokesperson inaccurately stated that "Credit card information, bank account information, or Social Security numbers were not stolen" and that Blackbaud claimed it had "credible information" that the stolen data went no further than the cybercriminals.[1]

9.      On September 29, 2020 in a Form 8-K public filing with the Securities and Exchange Commission (the "SEC"), Blackbaud acknowledged publicly for the first time that the Data Breach had occurred and f that the information taken in the Data Breach included not only names and addresses, and may have included "some unencrypted fields intended for bank account information, social security numbers, user names and/or passwords." [2]

10.     In or about September 29, 2020 or in October 2020, Blackbaud informed certain of its educational customers that in fact, it had maintained sensitive and PII information of its students and faculty on its data base and that such information was not encrypted.

11.     For example, Blackbaud stated with respect to Joseph Kushner Academy (the "Kushner School"), a not-for-profit religious school in New Jersey, that it had told the Kushner School that all of its information had been encrypted when, in fact, "some fields intended for sensitive information," that had been "leftover" from prior cloud computing services, existed in a "system table" in its Educational Edge solution that was not viewable to the school and included "unencrypted numbers", had been exposed in the Data Breach.  Such information including the social security numbers of its students and

---

[1] *The NonProfitTimes*dated July 16, 2020 online as https://www.thenonprofittimes.com/npt_articles/breaking-blackbaud-hacked-ransom-paid (last accessed November 30, 2020.)

[2] See Blackbaud Form 8-K filed with the SEC on September 29, 2020, See https://www.sec.gov/ix?doc=/Archives/edgar/data/1280058/000128005820000044/blkb-20200929.htm,(last accessed November 30, 2020

faculty, existed in "old, unused tables that remain from legacy version."[3]  The notice further stated that this information was subject to the Data Breach, and in recognition of the damage such Breach caused and will cause, Blackbaud offered to provide identity theft protection services for a two-year period to all individuals whose social security numbers were improperly stored.

12.    The Data Breach was the result of Blackbaud's failure not only to properly and adequately determine whether it was susceptible to a data breach but its negligent and reckless failure to remove old unused and obsolete data containing PII belonging to former students and their parents, and some faculty members or to encrypt such information as it had indicated to its customers. Blackbaud, in fact, had no valid business reason for retaining such records containing highly sensitive and private PII –including Social Security numbers-- of former students and their parents and for failing to delete or, at a minimum. encrypt such information.

13.    Remarkably Blackbaud retained this PII in unencrypted form on older legacy versions of its programs thus making public exposure of this PII in a cyberattack very likely. Blackbaud, thus, failed to properly maintain the security of its computer systems and network in a manner that would not subject it to a successful hack, and then after being hacked capitulated to the demands of a hacker to pay ransom, and without being able to confirm that all of the relevant information, including Plaintiffs' and Class Members' PII, was returned and not misused despite Blackbaud's false assurances to the contrary.

14.    Blackbaud's course of conduct was knowing, reckless and, at bare minimum, negligent. In addition, as described below, Blackbaud's conduct violated its own stated privacy policies as well as its agreements with Blackbaud Education Customers such as the Kushner Academy.

15.    Upon information and belief, the mechanism of the cyberattack and potential improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Blackbaud which was on notice

---

[3] The email dated September 29, 2020 from Olivia Bryant of Blackbaud to Daniel Israeli is attached hereto as Exhibit A.

that failing to take steps necessary to secure the PII from those risks left that property in a vulnerable condition.

16.     Defendant and its employees failed to properly monitor their computer network and systems that stored the PII and failed to implement appropriate policies to ensure secure communications and, to properly train employees regarding ransomware attacks.  Had Defendant properly monitored its networks, security, and communications, and in particular ensured that even its legacy information was encrypted, it would have discovered the cyberattack sooner or prevented it altogether. In fact, Blackbaud has announced it has "already implemented changes to prevent this specific issue from happening again."[4]  In other words, had these changes been in place previously, this incident would not have happened and Plaintiffs' and Class Members' PII would not have been accessed.

17.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft.  Armed with the PII accessed in the Data Breach, identity thieves can commit a variety of crimes including, e.g., using Plaintiffs' and Class Members' names to access to bank accounts, tax filings as well as using Plaintiffs' and Class Members' PII information to obtain government and insurance benefits. Some of the Plaintiffs and many of the Class Members are in very early stages of their lives—in their 20s and 30s- and thus the exposure of their PII for many years dramatically increases the level of damage as a result of  this Data Breach. Should Plaintiffs and the Class rely on Defendant's assurance that the data thieves destroyed the subset copy simply because Blackbaud paid the ransom and the data thieves confirmed the copy was destroyed? The answer is clearly no.   Plaintiffs and Class Members must now and in the future closely monitor their identities and accounts to guard against identity theft and to remedy identity theft that does occur.

---

[4] https://www.blackbaud.com/securityincident (Last Accessed November 30, 2020).

18.    Blackbaud's offer of free data monitoring on "Single Bureau Credit Monitoring Services" for two years and "access remediation support" from CyberScout Fraud Investigator during the "service period" which is two years, is plainly inadequate as the PII stolen can be utilized by thieves at any time after two years.  Consequently, Plaintiffs and Class Members have incurred and will incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19.    Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose PII, and in particular, their social security numbers, was maintained in unencrypted form on legacy versions of Blackbaud's Education Edge solution remaining on Blackbaud's systems and was wrongfully accessed during the Data Breach. and seek remedies including, but not limited to, compensatory or punitive damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

20.    Accordingly, Plaintiffs bring this class action lawsuit on behalf of themselves and those similarly situated, in order to address: (1) Blackbaud's inadequate safeguarding of Class Members' PII, which it managed, maintained, and stored, (2) Blackbaud's  failure to remove Plaintiffs' and Class Members' PII from legacy versions of its Education Edge program when it was no longer being used for any practicable business purpose; (3) Blackbaud's failure to encrypt Plaintiffs' and Class Members PII; (4) Blackbaud's failure to provide timely and adequate notice to Plaintiffs and other Class Members that their sensitive PII information, including Social Security numbers, had been subject to the unauthorized access of an unknown third-party; (5) Blackbaud's failure to timely identify all information that was accessed; and (6) Blackbaud's failure to provide Plaintiffs and Class Members with adequate redress for the Data Breach.

21.     Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct and asserting claims for negligence and breach of implied contract.

## PARTIES

22.     Plaintiff Martin Roth is a resident and a citizen of New Jersey and a parent of two former students of the Kushner School. Mr. Roth received a letter dated November 23, 2020 notifying him that his social security number and other personal information was subject to the Data Breach.[5]

23.     Plaintiff Chari Roth is a resident and a citizen of New Jersey and a parent of two former students of the Kushner School.  Ms. Roth received the same letter dated November 23, 2020 notifying her that her social security number and other personal information was subject to the Data Breach

24.      Plaintiff Rachel Roth is a resident and a citizen of New Jersey and a former student of the Kushner School. Ms. Roth received the same letter dated November 23, 2020 notifying her that her social security number and other personal information was subject to the Data Breach.

25.     Martin and Chari Roth, as parents of then minor Rachel Roth, provided personal confidential information to the Kushner School including, among other things, theirs and their daughter's physical addresses, phone numbers, email addresses, and Social Security numbers.

26.     Defendant Blackbaud is a Delaware corporation with its principal place of business located at 65 Fairchild Street, Charleston, South Carolina.

27.     Blackbaud is a publicly traded company whose clients include "nonprofits, foundations, corporations, education institutions, healthcare institutions, and the individual change agents who support them."  Blackbaud provides its clients with "cloud software, services, expertise, and data intelligence…." [6]. Blackbaud manages, maintains, and provides cybersecurity for the data obtained by its clients who are, *inter alia*, schools, not for profit companies and healthcare facilities, including the

---

[5] A copy of the November 23, 2020 letter is attached hereto as Exhibit B.
[6]  https://www.blackbaud.com/company (last accessed November 30, 2020)

Kushner School. Blackbaud represents that since originally incorporating in New York in 1982. It represents that it has become "the world's leading cloud software company powering social good."[7]

28.    In 2019, Blackbaud reported that it had "45,000 customers located in over 100 countries," with a "total addressable market (TAM)… greater than $10 billion." [8]

29.    In the ordinary course of doing business with its clients, individuals are regularly required to provide Blackbaud's clients with sensitive, personal and private information that is then stored, maintained, and secured by Blackbaud.  In the case of educational institutions like the Kushner School, this information included PII, including full names, dates of birth and physical address and social security numbers which Blackbaud found to be unencrypted.

30.    At all relevant times, Blackbaud knew the PII it stored was vulnerable to cyberattack, yet took insufficient or no steps to make sure that its legacy information was encrypted or eliminated.  In its 2019 Annual Report, Blackbaud specifically addressed its known susceptibility to cyberattacks. Specifically, the report states,

> ***If the security of our software is breached, we fail to securely collect, store and transmit customer information, or we fail to safeguard confidential donor data, we could be exposed to liability, litigation, penalties and remedial costs and our reputation and business could suffer.***
>
> Fundamental to the use of our solutions is the secure collection, storage and transmission of confidential donor and end user data and transaction data, including in our payment services. Despite the network and application security, internal control measures, and physical security procedures we employ to safeguard our systems, **we may still be vulnerable to a security breach, intrusion, loss or theft of confidential donor data and transaction data, which may harm our business, reputation and future financial results.** [Emphasis Added].
>
> Like many major businesses, we are, from time to time, a target of cyber-attacks and phishing schemes, and we expect these threats to continue. Because of the numerous and evolving cybersecurity threats, including advanced and persistent cyber-attacks, phishing and social engineering schemes, used to obtain unauthorized access, disable or degrade systems have become increasingly more complex and sophisticated **and may be**

---

[7]  Blackbaud Annual Report for 2019 online at  https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417 (Last Accessed December 17, 2020).
[8] *Id.*

**difficult to detect for periods of time, we may not anticipate these acts or respond adequately or timely**... [Emphasis Added.

*        *        *        *

Further, the existence of vulnerabilities, even if they do not result in a security breach, may harm client confidence and require substantial resources to address, and we may not be able to discover or remedy such security vulnerabilities before they are exploited, which may harm our business, reputation and future financial results. [9]

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this section matter pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Blackbaud and is a citizen of a foreign state.

32.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1376. This Court has personal jurisdiction over Blackbaud because Blackbaud transacts substantial business in this jurisdiction and has committed a tort in this jurisdiction.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events, acts, and omissions occurred in this District and Plaintiffs reside in this District.

## BLACKBAUD VIOLATED ITS OWN PRIVACY POLICIES

34.     Because of the highly sensitive and personal nature of the information Blackbaud maintains, manages, and secures with respect to its clients and their users, Blackbaud has represented to its clients and users that this information will be comprehensively secured.

35.     Blackbaud's Privacy Policy North America ("Privacy Policy") expressly applies as follows:

At Blackbaud, we are committed to protecting your privacy. This Policy applies to Blackbaud's collection and use of personal data in connection with our marketing and provision of the Blackbaud Solutions, customer support and other services (collectively, the "Services"), for example if you are a customer, visit the website, interact with us at

---

[9] *Id.*

industry conferences, or work for a current or prospective customer of the Services. Target Analytics® collects data on individuals in the United States to provide non-profit customers with accurate information on their prospective constituents in the Social Good space. You can read more about our privacy practices for Target Analytics® below. The Services don't include Just Giving and everydayhero, which have their own privacy policies. The terms "personal data" or "personal information" refer to information that can reasonably identify an individual.

If you're a constituent, supporter, patient or student of one of our customers, to which we provide the Services, your data will be used in accordance with that customer's privacy policy. In providing the Services, Blackbaud acts as a service provider and thus, this Policy will not apply to constituents of our customers.[10]

36.     With regard to securing the personal information of its constituents, supporters, patients or students, Blackbaud further represents:

We restrict access to personal information collected about you at our website to our employees, our affiliates' employees, those who are otherwise specified in this Policy or others who need to know that information to provide the Services to you or in the course of conducting our business operations or activities. While no website can guarantee exhaustive security, we maintain appropriate physical, electronic and procedural safeguards to protect your personal information collected via the website. We protect our databases with various physical, technical and procedural measures and we restrict access to your information by unauthorized persons. We also advise all Blackbaud employees about their responsibility to protect customer data and we provide them with appropriate guidelines for adhering to our company's business ethics standards and confidentiality policies. Inside Blackbaud, data is stored in password-controlled servers with limited access.[11]

37.     Defendant has further failed Plaintiffs and Class Members by not adequately securing and protecting their PII, by maintaining Plaintiffs and Class members PII on the legacy versions of its software for no reasonable or practicable business purpose, which, as proven by the Data Breach, were exposed to hacking and theft.

38.     Defendant failed Plaintiffs and Class Members by failing to adequately notify them of the extent of the Data Breach by falsely assuring Plaintiff and the Class and its clients in its public statements and statements to the Kushner School and other Blackbaud Education Customers as reflected

---

[10] https://www.blackbaud.com/company/privacy`-policy/north-america (Last Accessed November 30, 2020).
[11] *Id.*

in the August 11 Notification that the attack only impacted certain personal information and specifically did not include Social **S**ecurity numbers.

39.     Incredibly, as reported in the July 16 Announcement, Blackbaud President and CEO, Mike Gianoni, told *The NonProfit Times* that Blackbaud had "no reason to believe it [the Data Breach] will result in any disclosure of our customers' data."[12]

## <u>THE PLAINTIFFS' DATA IS BREACHED</u>

40.     On August 11, 2020, Plaintiffs were informed by the Kushner School that they may have had their names, addresses, dates of birth and donor history compromised by the Data Breach. (the "August 11 Notification"). The August 11 email referenced Blackbaud's specific assurances as told to the Kushner School "that cyber criminals did not gain access to social security numbers." [13]

41.     The August 11 Notification explained that Blackbaud had engaged law enforcement and forensic experts to assist it in its investigation of the Data Breach and concluded that the cybercriminal removed data from Blackbaud's systems intermittently between February 7, 2020 and May 20, 2020. A backup file containing "personnel" information was removed by the cybercriminal. According to Blackbaud, they paid the cybercriminal ransom to ensure that the backup file was "permanently destroyed."

42.     On September 29, 2020, the same day as public disclosure by Blackbaud in its Form 8-K and on its website (see paragraph 50 & 52 below), Blackbaud informed the Kushner School by email that PII of former students and their parents, and former or current faculty was included in unencrypted information taken in the Data Breach and that, contrary to Blackbaud's representations that all sensitive information was encrypted,  the unencrypted data stored by Blackbaud was not encrypted and may have

---

12 *The NonProfitTimes* dated July 16, 2020 online as https://www.thenonprofittimes.com/npt_articles/breaking-blackbaud-hacked-ransom-paid (last accessed November 30, 2020.)
      [13] The August 11 Notification is attached hereto as Exhibit C.

been accessed by the cybercriminals may have included Social Security numbers from either student, faculty or parents of the Kushner School. Further the email stated that this PII was in an unencrypted form not viewable to the Kushner School and that Blackbaud believed existed in "unused tables" remaining on a legacy version of a Blackbaud program. See Exhibit A.[14]

43.     Plaintiffs were informed of these developments directly by letter to Plaintiffs from Daniel Israeli to Plaintiffs dated November 23, 2020. See Exhibit B.  The letter was based on the information provided to the school by Blackbaud as to the identities of persons whose PII, including social security numbers, was unencrypted on the legacy software that was obtained by the cybercriminals. These persons were all former students, their parents and some faculty members. The last of these former students had graduated by 2018.

44.     Blackbaud, acknowledging its dereliction, offered to provide Plaintiffs and Class members whose social security numbers were taken with "Single Bureau Credit Monitoring" for a period of two years and "access remediation support" from CyberScout Fraud Investigator during the "service period" which is two years.

45.     Prior to the ransomware attack, the Kushner School and, on information and belief, other Blackbaud Education Customers, stored the PII of students, their parents, and faculty with Blackbaud in the course of Blackbaud's performance of various services. Such students, their parents s and faculty members of the Kushner School and other Blackbaud Education Customers, believed that such information would be kept confidential and secure.

46.     When providing such information, these Plaintiffs and Class Members, had the expectation that Blackbaud would take all steps necessary to adequately secure the information against

---

[14] In addition, the notification stated that the bank account number and vendor tax identification number of the Kushner School was also exposed in the hack.

hackers and cyberattacks, including encrypting it or eliminating unnecessary and unused information on older legacy programs on Blackbaud's systems.

47.     Once it obtained this PII from the Kushner School and other Blackbaud Education Customers, Blackbaud maintained Plaintiffs' and Class Members' PII on a shared network, server, and/or software and despite its own awareness of steady increases of cyberattacks on health care institutions, schools, and other facilities over the course of recent years, did not maintain adequate security of Plaintiffs' and Class Members' data.. Particularly egregious is that Blackbaud continued to keep legacy versions of the software on its systems, despite the fact that by the time of the Data Breach there was no valid business reason to continue to maintain this information on its systems. The failure was at minimum negligent given the known risks to Blackbaud. The breach of Plaintiffs and Class members' PII, particularly their social security numbers, is a direct consequence of this conduct.

48.     According to its own statements dated September 29, 2020 in May of 2020, Blackbaud discovered a ransomware attack that attempted to "disrupt business by locking companies out of their own data and servers."[15]  According to Blackbaud's statements:

> After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment. The cybercriminal did not access credit card information, bank account information, or social security numbers. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, **we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly**[16] (emphasis supplied)

49.     Defendant cannot reasonably rely on the word of data thieves or a "certificate of destruction" issued by those same thieves, that the copied subset of any PII was destroyed.  Had

---

[15] https://www.blackbaud.com/securityincident (Last Accessed December 17, 2020).

[16] *Id.*

Defendant been sure that such information had been completely recovered and not copied and subject to misuse, it would not have advised the affected individuals to monitor accounts for suspicious activity or offered credit monitoring and to encrypt that information by the end of the October and delete it by the end of the year. Despite recognizing the need for monitoring and heightened risk, Defendant has failed to offer Plaintiffs or Class Members adequate mitigation or remedy, since the effects of such a massive Data Breach involving the most sensitive personal information, i.e. social security numbers, will likely last well beyond the limited two year period offer by Defendant.

50.     The above September 29, 2020 statement by Blackbaud also stated that

> Further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords. In most cases, fields intended for sensitive information were encrypted and not accessible. These new findings do not apply to all customers who were involved in the incident. Customers who this applies to who we believe are using these fields for such information were contacted the week of September 27, 2020 and were provided with additional support.[17]

51.     Thus, despite having knowledge of the attack since at least May of 2020, Blackbaud did not notify its affected clients until the end of September that their PII including social security numbers, had been compromised.

52.     Defendant has had obligations and duties created by state and federal law, contracts, industry standards, common law, and privacy representations made to Plaintiffs and Class Members, to keep their PII confidential and secure, and to protect it from unauthorized access and disclosure.

53.     Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

---

[17] *Id.*

54.     Defendant's data security and other obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in its client's various industries preceding the date of the breach.

55.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industries.

56.     Defendant failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

     (i)   failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

     (ii)  failing to properly monitor its own data security systems for existing intrusions;

     (iii) failing to destroy highly confidential personal data information including Social Security numbers on its legacy software which was unnecessarily kept on Blackbaud's systems despite no reasonable or practicable business reason for doing so; and

     (iv)  in other ways yet to be discovered.

57.     As the result of Defendant's failure to take certain measures to prevent the attack until after the attack occurred, Defendant negligently and unlawfully failed to safeguard Plaintiffs and Class Members' PII.

58.     Accordingly, as outlined below, Plaintiffs' and Class Members' daily lives were disrupted.  Now Plaintiffs and Class Members, including many former students at the start of their lives in their 20s and 30s, face an increased and prolonged risk of fraud and identity theft.

**CYBERATTACKS AND DATA BREACHES CAUSE DISRUPTION AND PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTIFY THEFT**

59.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") finding that victims of identity theft will face

"substantial costs and time to repair the damage to their good name and credit record."[18]

60.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[19]

61.    Identity thieves use stolen PII for a variety of crimes, including insurance fraud, and identity theft.  A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[20]



[18] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 12, 2019) ("GAO Report").

[19] *See* https://www.identitytheft.gov/Steps (last visited April 12, 2019).

[20] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics1276.php (last visited August 12, 2020).

62.     Private Information is a valuable property right.[21] Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts include heavy prison sentences.  This obvious risk to reward analysis illustrates that private information, including PII, has considerable market value.

63.     There may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when private information, PII and/or financial information is stolen and when it is used. According to the U.S.

Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

64.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

65.     There is a strong probability that entire batches of stolen information have been either dumped on the black market and/or are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

---

[21] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

## **PLAINTIFFS' AND CLASS MEMBERS' DAMAGES**

66.     To date, Defendant has not provided Plaintiffs and Class Members with adequate relief for the damages they have suffered as a result of the Data Breach. They have offered only a two- year subscription to a not well-known data monitoring service and some other not yet defined service called "access remediation support" also for only a two-year period. The risks of having one's Social Security numbers exposed continue long after two years as the U.S. Government Accountability Office has determined "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."

67.     Therefore, Plaintiffs and Class Members have been damaged by the compromise of their PII and have not received adequate relief from Blackbaud.

68.     Plaintiffs' and Class Members' PII was compromised as a direct and proximate result of the Data Breach.  While the compromise of  this PII was known as early as May of 2020, Plaintiffs were not put on notice that their Social Security numbers were at risk until at the earliest September 29, 2020, when Blackbaud for the first time it is believed publicly disclosed the extent of the data breach.

69.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Numerous courts have recognized the propriety of loss of value damages in related cases.

70.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse.

71.     Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as insurance being taken in their names, medical bills being charged to them, and other issues.

72.     Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

73.     Plaintiffs have incurred and Class Members have or will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

74.     Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach.  Like Plaintiffs, many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.     Purchasing long term credit monitoring and identity theft prevention;

    b.     Placing "freezes" and "alerts" with credit reporting agencies; and

    c.     Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

75.     Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online, is encrypted and that access to such data is password-protected.

76.     Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the knowledge that their PII—which contains the most intimate details about a person's life, may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of their fundamental right to privacy.  As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm

77.    As many of the purchasers of PII utilize the information only years after the breach, Plaintiffs and Class Members are forced for long periods of time to endure the fear of whether their information will be exploited by criminals and identity thieves.

## CLASS ACTION ALLEGATIONS

78.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

79.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

All persons, whose PII, including social security numbers, were maintained in unencrypted form on legacy versions of Blackbaud's Education Edge solution and were exposed in the Data Breach (the "Class")

Excluded from the Class is the Defendant, its officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

80.    <u>Numerosity</u>.  The members of the Class and/or subclass are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of at minimum thousands of persons whose data was compromised in the Data Breach. The exact identities and numbers of members of the Class whose PII was included on the "unencrypted fields intended for bank account information, social security numbers, user names and/or passwords", as described by Blackbaud in its 8-K filing, can be positively identified through discovery of Blackbaud thus determining the identities of those "customers" contacted, or intended to be contacted [by Blackbaud], the week of September 27, 2020.

81.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems, and in particular Blackbaud's systems, prior to and during the Data Breach, complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Plaintiffs and Class Members to safeguard their PII;

f.    Whether Defendant breached their duty to Plaintiffs and Class Members to safeguard their PII;

g.    Whether computer hackers obtained, sold, copied, stored or released Class Members' PII;

h.    Whether Blackbaud knew or should have known that its data security systems and monitoring processes were deficient;

i.    Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant's conduct was negligent;

k.    Whether Defendant's conduct was *per se* negligent;

l.    Whether Defendant's conduct constituted a breach of an express or implied contract;

m.    Whether Defendant's conduct constituted a breach of New Jersey law;

n.    Whether Defendant failed to provide notice of the Data Breach in a timely manner, and

o.    Whether Plaintiffs and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

82.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

83.    <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs' Counsel are competent and experienced in litigating class actions.

84.     <u>Predominance</u>. Defendant has engaged in a common course of conduct toward

Plaintiffs and Class Members, in that all the Plaintiffs and Class Members' data was stored on the same

computer systems and allowed to be unlawfully accessed in the same way.  The common issues arising

from Defendant's conduct affecting Class Members, as described *supra*, predominate over any

individualized issues. Adjudication of the common issues in a single action has the important and

desirable advantages of judicial economy.

85.     <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient

adjudication of the controversy. Class treatment of common questions of law and fact is superior to

multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would

likely find that the cost of litigating their individual claim is prohibitively high and would therefore have

no effective remedy. The prosecution of separate actions by individual Class Members would create a

risk of inconsistent or varying adjudications with respect to individual class members, which would

establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a

class action presents far fewer management difficulties, conserves judicial resources and the parties'

resources, and protects the rights of

each class member.

86.     Defendant has acted on grounds that apply generally to the Class as a whole, so that class

certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## <u>FOR A FIRST CAUSE OF ACTION</u>
### NEGLIGENCE

87.     Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set

forth therein.

88.     Blackbaud had a duty of care to use reasonable means to secure and safeguard its

computer systems, including those containing legacy information—and Plaintiffs' and Class Members'

PII held within it—to prevent disclosure of the information, and to safeguard the information from cyber theft. Blackbaud's duty included a responsibility to implement processes by which it could detect and prevent a breach of its security systems in a reasonably expeditious manner and to give prompt notice to those affected by a data breach and/or ransomware attack.   It also included either deleting unused legacy information or encrypting it so that it was not vulnerable to being hacked.

89.     Blackbaud owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected and safeguarded the PII of the Class.

90.     Blackbaud's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Blackbaud and Plaintiffs and Class Members, which is recognized by Blackbaud's Policy Notice North America, as well as laws and regulations. Blackbaud was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a ransomware attack and/or data breach.

91.     Blackbaud had a specific duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

92.     Blackbaud's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Blackbaud is bound by industry standards to protect confidential PII.

93.     Blackbaud breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Blackbaud include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII, and in particular PII that was contained on legacy systems;

b.    Failing to adequately monitor the security of their networks and systems;

c.    Failure to update their systems and destroy PII of Plaintiffs and Class Members that Blackbaud no longer needed for any valid business purpose;

d.    Failure to encrypt the PII of Plaintiffs and Class Members;

e.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

f.    Allowing unauthorized access to Class Members' PII;

g.    Failing to detect in a timely manner that Class Members' PII had been compromised; and

h.    Failing to timely notify Plaintiffs and Class Members about the extent of the Data Breach and ransomware attack –i.e. that it included the most personal and delicate information such as social security numbers- so those put at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages.

94.    It was foreseeable that Blackbaud's failure to use reasonable measures to protect Class Members' PII, and in particular, PII that was contained on legacy systems, including either deleting such information or encrypting it, would result in injury to Class Members.  Further, the breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches in the Blackbaud's clients' various industries.

95.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

96.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

97.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Blackbaud to, *e.g.,* (i) strengthen its data security systems and monitoring procedures and to take particular measures with respect to PII from legacy systems; (ii) submit to future annual audits of those systems

and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members, and any other relief this Court deems just and proper.

**FOR A SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**

98.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs, as if fully set forth herein

99.    When Plaintiffs and Class Members provided their PII to Defendant's clients such as the Kushner School and other Blackbaud Education Customers in exchange for its' services, they entered into implied contracts with Defendant pursuant to which Blackbaud agreed to reasonably protect such information.

100.    Blackbaud solicited and invited Plaintiffs and Class Members to provide their PII as part of its regular business practices, including through its Privacy Policy. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to the Kushner School or other Blackbaud Education Customers who provided it to Blackbaud.

101.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Blackbaud's data security practices complied with relevant laws and regulations and were consistent with industry standards.

102.    Plaintiffs and Class Members accepted service from, and paid money to the Kushner School and other Blackbaud Education Customers in exchange for which Plaintiffs and Class Members reasonably believed and expected that Blackbaud would use part of those funds to maintain adequate data security.  Blackbaud failed to do so.

103.    Plaintiffs and Class Members would not have entrusted their PII to Blackbaud in the absence of the implied contract between them and Blackbaud's promise to keep their information secure. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data

security measures, and that it would monitor any third party vendor to whom it provided access to Plaintiffs' and Class Members' PII.

104.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Blackbaud.

105.    Blackbaud breached its implied contracts with Plaintiffs and Class Members by failing to safeguard and protect their PII.

106.    As a direct and proximate result of Blackbaud/ss breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

107.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

108.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Blackbaud to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

a)  For an Order certifying this action as a class action and appointing Plaintiffs and their Counsel to represent the Class;

b)  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PII, including deleting all legacy information and/or encrypting it so that it is not vulnerable to a data breach;

c)  For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for not less than seven years of credit/identity theft monitoring services for Plaintiffs and the Class;

f)  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g)  For an award of punitive damages, as allowable by law;

h)  For an award of attorneys' fees and costs, and any other expense, including reasonable expert witness fees;

i)  Pre- and post-judgment interest on any amounts awarded; and

j)  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.


Dated: December 22, 2020

By:  /s/ Howard T. Longman

Howard T. Longman
New Jersey Bar # 264 882018
STULL, STULL & BRODY
354 Eisenhower Parkway, Suite 1800
Livingston, New Jersey 07039
Tel: (973) 994 2315
Fax: (974) 994 2319
Hlongman@ssbny.com

Lynda J. Grant
THEGRANTLAWFIRM, PLLC
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442
lgrant@grantfirm.com

Attorneys for Plaintiffs and the Class